Argued at Pendleton May 3; reversed June 15, 1937

CITY OF ENTERPRISE *v.* STATE ET AL.

(69 P. (2d) 953)

*Fred H. Paulus,* of Salem (I. H. Van Winkle, Attorney General, and Willis S. Moore, Assistant Attorney General, on the brief), for the State of Oregon, State Bond Commission and Rufus C. Holman, as treasurer.

*Roy F. Shields,* of Portland (Maguire, Shields & Morrison, of Portland, on the brief), for H. F. Ong.

*Fred S. Wilhelm,* of Portland, for Oscar W. Nilsson.

*Hallock, Donald & Banta,* of Baker, for Bank of Haines.

*Sylvester H. Burleigh,* of La Grande (Burleigh & Burleigh, of La Grande, on the brief), for City of Enterprise.

ROSSMAN, J.  The issues presented by this appeal concern primarily the validity of 1933 Session Laws, chapter 433, as amended by 1933 Session Laws, second special session, chapter 62.  To the City of Enterprise, which instituted this proceeding as petitioner, we shall refer as the plaintiff, and to the defendants, which are the State, the State Bond Commission (1935 Oregon Code Supplement, § 68-501), the State Treasurer, and the three individual owners of securities issued by the plaintiff, as the defendants.  The State owns bonds issued by the City of Enterprise which are in the custody of its treasurer and bond commission.  The pro-

visions of 1933 Session Laws, chapter 433, known as the Municipal Administration Act, may be summarized as follows: Any county, city, school district, port or water district having a population of less than 100,000 inhabitants, that has defaulted for a period of six months in the payment of a judgment or any contractual indebtedness is subject to the act. A petition filed in the circuit court by the municipality's governing body, or by the owners of not less than 25 per cent of its defaulted indebtedness, delineating the circumstances, and followed by service and proof of the facts averred, authorizes the court to appoint an administrator for the municipality. The individual appointed qualifies by taking an oath and furnishing a bond "in such amount as the court and the state treasurer shall determine, * * * The compensation of said municipal administrator shall be fixed by the court with the approval of the state treasurer at an amount not to exceed $3,600 per annum, and in determining said compensation the court and said treasurer shall take into consideration * * *."

Section 6 provides:

"Upon appointment, the said municipal administrator forthwith shall investigate the financial affairs of said municipal corporation, and shall report to the state treasurer and to the circuit court * * *."

Section 7 provides:

"Subject to the direction of said court, the said municipal administrator shall be and hereby is authorized and directed to assume complete control of the fiscal affairs of said municipal corporation, and during the incumbency of said administrator, no funds shall be expended or transferred without the written approval of said administrator."

Continuing, the section vests in the administrator authority to employ assistants and to sign all of the

municipality's checks and warrants; it provides that no future contracts involving the payment or receipt of money shall be valid unless bearing his written approval; it invests him with power to sue and to be sued; and it authorizes him to adjust or liquidate "by and with the approval of the court and the governing body of said municipal corporation, any of the current or fixed obligations of said municipal corporation. * * * Said administrator shall have charge of the hiring and discharging of all persons other than elective officers employed by said corporation, and shall have authority to fix their salaries as well as the salaries of said elective officers. No levies of taxes for the payment of fixed and current obligations and operating costs of said municipal corporation shall be valid unless approved by said administrator." The section directs that the administrator shall collect all rentals, delinquent taxes, accounts receivable, etc., and outlines a method for the foreclosure of tax and other liens possessed by the municipality. Section 8 provides that if the municipality's revenues prove to be insufficient to discharge operating expenses the administrator may employ "such amount of bond principal and interest funds in his hands as may be necessary to defray the balance of such operating charges for the remainder of the fiscal year". Section 9, after providing that refunding bonds cannot be issued unless 80 per cent of the holders of the defaulted issue consent to receive them, outlines a method whereby presumptive consent of the remaining 20 per cent may be obtained.

Section 10 provides:

"Except as herein provided, all other powers conferred and imposed by law or charter of the particular municipal corporation shall not be affected or curtailed, and the authority of the municipal administrator herein

granted shall be limited to the management and control of the fiscal affairs and the liquidation and refinancing of the indebtedness of said corporation, pursuant to the provisions of this act. The laws pertaining to the debt limitation of municipalities shall not apply to any municipalities that shall fund, refund, compromise or adjust their fixed obligations under the provision of and in the manner as provided by this act."

Section 11 directs that after the administrator has completed his work he "shall file with the circuit court with which the original petition * * * was filed a sworn statement of the existing financial condition of said corporation," and that if the statement satisfies the court that the municipality "is in such financial condition as no longer to require the services and financial supervision of said municipal administrator" it may discharge him. The following is Section 12, the concluding part of the act:

"If any section, sentence or clause in this act shall be held invalid or unconstitutional, such fact shall not affect the validity of the remaining portion of the same. That all laws or parts of laws in conflict with the provisions of this act hereby are repealed."

Nineteen Thirty-three Session Laws, second special session, chapter 62, amends this act by including within its purview drainage and irrigation districts. We pass by all arguments based upon procedure, and proceed to a consideration of contentions that attacked the validity of the act.

It will be observed that the statute authorizes the appointment of an administrator for defaulting municipalities, and that the appointment is made by the circuit court which determines the amounts of his undertaking and compensation. It will be further observed that the appointee is "subject to the direction of

said court'' in pursuing his task of assuming ''complete control of the fiscal affairs of said municipal corporation''. His reports are filed with the circuit court. His efforts to ''adjust, compromise, settle or liquidate'' the municipality's indebtedness are made ''by and with the approval of the court and the governing body of said municipal corporation''. His final discharge, when his duties have been completed, is made by the circuit court. While the administrator's duties are confined to management of the fiscal affairs of the city, his power is, nevertheless, great. He possesses the sole authority to sign its checks, warrants, etc. He possesses a veto power over its contracts. While he has no authority to discharge an elective official, he, nevertheless, has the power to fix the salary of such individual as well as authority to hire, discharge and fix the salaries of all other city employees. Thus, all of its activities that contemplate the expenditure of money are subjected to his control. By way of illustration, we add that if the municipality has an appointive municipal judge the tenure of the latter as well as his salary is subject to the administrator.

■ The act clearly contemplates equity receiverships for insolvent municipalities. It employs the term municipal administrator, but includes within that term all of the power usually possessed by a receiver. Ordinarily, a receivership (1) places a court officer in charge of the assets of the insolvent; (2) creates concerted action in behalf of all of the creditors, thereby avoiding action by one at the expense of the others; (3) finally concludes with a sale of the assets of the insolvent; and (4) brings about ratable realization by all of the creditors. As already indicated, a receiver is an officer of the court which appointed him, and the

assets of the insolvent, upon appointment of the receiver, are in *custodia legis*. In the present instance, the third element may be missing because, ordinarily, municipalities possess no property not devoted to public uses which is for sale. But, likewise, many insolvent persons possess nothing available for sale by the receiver. Again, our act does not expressly stay litigation against the municipality and, hence, we assume that if the three actions now pending against it eventually ripen into judgments, the judgment creditors will apply for writs of mandamus to compel the levying of taxes for their benefit. But in jurisdictions where mandamus is subject to the exercise of judicial discretion the court may refuse to issue the writ when it appears that sincere efforts are being made by the municipality to provide to the utmost of its power for the payment of its creditors: *City of Asbury Park v. Christmas,* 78 Fed. (2d) 1003 (certiorari denied, 296 U. S. 624 (56 S. Ct. 147, 80 L. Ed. 443)). In the decision just cited the insolvency of the municipality had been judicially determined pursuant to 1931 Laws of New Jersey, chapter 340, and, pursuant to the same act, the state tax commission had assumed control over its fiscal affairs.

■ As stated, we believe that the purpose of the act is to authorize the appointment, upon application, of a receiver for defaulting municipalities. Upon appointment the receiver, as an officer of the circuit court, becomes vested with the extensive power which the act confers, and it becomes his duty to investigate the municipality's finances, to effect economies, to supervise the annual tax levy, and to refinance the municipality's indebtedness. Thus, in all financial matters the receiver possesses the power of a mayor, of a municipal legislator, and of all other municipal officers.

In the absence of legislation neither the federal nor the state courts possess power to appoint receivers for insolvent local political subdivisions of a state: 46 Yale Law Journal 199, at 202; 33 Col. Law Rev. 28, at 53; Tardy's Smith on Receivers (2d Ed.) § 537; 44 C. J., Municipal Corporations, p. 1548, § 4657. In the second cited treatise at the page indicated the author states:

"An equity receiver will not be appointed to take over and administer the affairs of a public corporation in behalf of creditors in view of the political nature of the body and the fact that the court through its officer could not exercise the power of taxation."

In *Depew v. Venice Drainage Dist.*, 158 La. 1099, (105 So. 78), the decision held that the Louisiana courts were without power to appoint receivers for municipalities even though a provision of the Louisiana constitution gave to the district courts of that state "unlimited" jurisdiction in all proceedings for the appointment of a receiver. The court stated:

"If this court should hold that the judiciary may take over and control the agencies of government and substitute its judgment for the discretion vested in the legally constituted authorities, the legislative and executive branches of government might as well cease to function. The contemplation of such a monstrosity is repugnant to common sense."

In *Meriwether v. Garrett*, 102 U. S. 472 (26 L. Ed. 197), it appeared that a Tennessee statute authorized the courts of that state to appoint receivers for defaulting municipal corporations. The city of Memphis defaulted and a receiver was appointed. In the above entitled decision the court vacated his appointment. From it we quote:

"The power of taxation is legislative and cannot be exercised otherwise than under the authority of the legislature."

May 24, 1934, the Congress enacted 48 Stat. 798, 11 U. S. C., §§ 301-303 (see also Pub. L. No. 507, 74th Congress, 2d Ses.), for the relief of insolvent municipalities as an amendment to the national bankruptcy act. Its purpose was to permit any insolvent local government unit to voluntarily file a petition in bankruptcy. The act required the petition to be accompanied by a plan for readjustment of the municipality's indebtedness approved by creditors holding at least 30 per cent of the obligations to be affected, and also a complete list of the municipality's creditors. The act outlined a method whereby further proceedings could be prosecuted for the readjustment of the municipality's indebtness and for its eventual approval by the federal court. In *Ashton v. Cameron County Water Improvement District*, No. 1, 298 U. S. 513, 516 (56 S. Ct. 892, 80 L. Ed. 1309), the court in a five to four decision held the act invalid. The majority believed that it was in conflict with the constitutional provisions which preserve the independence of the states.

In *Pryor v. Goza,* 172 Miss. 46 (159 So. 99), the court held invalid a statute which provided that whenever the assessed benefits of a drainage district were less in value than its indebtedness the latter might be scaled down in the manner allowed by the act, and that the new indebtedness could be made payable in a different manner than the original indebtedness. The court believed that the provisions of the act violated the contract clause of both the federal and the Mississippi constitutions.

The defendants believe that the source of our municipal administration act is 1929 General Laws of Texas, second session, chapter 46, page 80. The language of the two acts in many places is strikingly sim-

ilar. The purpose of the two is the same. Two years after the Texas act had been enacted the legislature of that state, in 1931 General Laws of Texas, regular session, chapter 26, page 33, repealed the act. The repealing act referred to the previous act as "unconstitutional in that it confers legislative powers upon the judiciary."

The Constitution of Oregon, Art. III, § 1, provides:

"The powers of the government shall be divided into three separate departments—the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this constitution expressly provided:"

■ It has been held too many times to require the citation of authority that the power of taxation is a legislative power—not a function of the judiciary. Likewise, the power to fix the salaries of municipal officers, and to effect municipal contracts is entirely foreign to the judicial branch of our government. Yet this statute undertakes to clothe an officer of the courts with power to be subtracted from municipal officers and to install him in an office which may very truthfully be termed municipal dictator. By appeal from his rulings all of the quarrels of the council chamber concerning legislative and administrative affairs would be transferred to the courtroom. It would become the city hall.

From 6 R. C. L., Constitutional Law, page 145, § 145, we quote:

"It has been said that this principle of the separation of the powers of government is fundamental to the very existence of constitutional government as established in the United States, and it has been referred to as one of the chief merits of the American

system of written constitutions. Although, as will appear later, there may be a blending of powers in certain respects, in a broad sense the safety of our institutions depends in no small degree on the strict observance of the independence of the several departments, each thereof being a check upon the exercise of its power by any other department. Accordingly a concentration of power in the hands of one person or class is prevented, inasmuch as it is regarded as a condition subversive of the constitution, and the chief characteristic and evil of tyrannical and despotic forms of government.''

The following is taken from *Searle v. Yensen*, 118 Neb. 835 (226 N. W. 464, 69 A. L. R. 257):

''The division of governmental powers into executive, legislative and judicial in this country is a subject familiar, not only to lawyers and students, but is a part of the common knowledge of the citizen. It represents, probably, the most important principle of government declaring and guaranteeing the liberties of the people, and has been so considered, at least, since the famous declaration of Montesquieu that 'there can be no liberty * * * if the power of judging be not separated from the legislative and executive powers. * * * Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would be the legislator: Were it joined to the executive power the judge might behave with all the violence of an oppressor.' In fact, the above proposition is declared in direct language by § 1, art. 2, of our Constitution: 'The powers of the government of this state are divided into three distinct departments, the legislative, the executive and judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except, as hereinafter expressly directed or permitted.' * * *

''The power of the legislature to delegate a part of its legislative functions to municipal corporations or

other governmental subdivisions, boards, commissions, and tribunals, to be exercised within their respective jurisdictions, cannot be denied; but the recipient of such powers must be members of the same governmental department as that of the grantor. Otherwise a confusion and duplication of powers would result, against which the section of the Constitution above quoted is directed. The Legislature may not impose upon the judiciary or the executive the performance of acts or duties not properly belonging to those departments respectively. * * *

"Let us then inquire of the nature of some of the duties imposed upon the district court by the sections under attack. They are set forth in § 4 and are as follows: (1) To determine from the testimony adduced at the hearing whether or not the district should be incorporated; (2) whether the suggested boundaries are reasonable and proper for the public convenience and welfare; (4) change, alter and fix the boundary lines of such district with the end in view of promoting the interest thereof and its units; and (4) to submit to the electors a proposal for a tax sufficient to pay the expenses of organization and election.

"These questions are all political and legislative in their nature. The duty of courts is to declare the law as established by the legislature, not to make it. * * * * *"

The act was held invalid.

From *O'Donoghue v. United States,* 289 U. S. 516 (77 L. Ed. 1356, 53 S. Ct. 740), we quote:

"The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, Springer v. Philippine Islands, 277 U. S. 189, 201, namely, to preclude a commingling of these essentially different powers of government in the same hands. * * * If it be important thus to separate the several departments of government and restrict them to the

exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments.''

It will be observed that the act under attack is very different from the New Jersey act above cited, concerning which many encomiums have been pronounced, and the validity of which was sustained in *Hourigan v. North Bergen Township,* 113 N. J. L. 143 (172 Atl. 193), inasmuch as the New Jersey tax commission, which assumes control after the default has been judicially determined, is not judicially appointed; nor is it an agency of the court. Likewise the act under attack is very different from 1935 Session Laws, chapter 386 (amended by 1935 Session Laws, special session, chapter 52), whereby the services of the state bond commission are rendered available to defaulting municipalities which, like the plaintiff, are indebted to the state. No judicial intervention whatever is necessary under that act.

■ We are firmly convinced that since this act contemplates that the judicial branch of our government shall exercise the above-mentioned legislative and executive functions, it is invalid. Being so convinced, we are satisfied that the circuit court erred when it entered its decree. It is unnecessary to express opinion upon the other contentions argued by the parties. The petition should be dismissed.

BEAN, C. J., and RAND and BAILEY, JJ., concur.