·No. 15,407.

FLANDERS ET AL. *v*. PUEBLO ET AL.
(160 P. [2d] 980)

Decided May 21, 1945.

1

Mr. JOHN W. ELWELL, for plaintiffs in error.

Mr. CHARLES M. ROSE, Messrs. DEVINE, PRESTON & PETERSON, Mr. MYLES P. TALLMADGE, Mr. ROBERT S. GAST, for defendants in error.

*En Banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

THESE parties appear here in the same order as in the trial court. Plaintiffs in error, residents and tax-payers, acting for themselves and all others similarly situated, are hereinafter referred to as plaintiffs. The City of Pueblo and its officers are referred to as Pueblo. Certain of defendants in error, being those only who answered below, are referred to as the bondholders.

In October, 1938, Pueblo passed Ordinance No. 1373 providing for the issuance and payment of certain so-called refunding bonds. That ordinance is hereinafter referred to simply as 1373. Some of these bonds are held by each of the defendants above mentioned. Plaintiffs sought to enjoin the enforcement of a levy to pay said bonds, alleging the illegality of the issue. Such further pleadings were filed as disclosed substantial agreement on the material facts, but diverse positions on questions of law on which the rights of the parties depend. Pueblo, setting up in its answer facts which it claims were those essential thereto, prayed for a

declaratory judgment settling the rights of the respective parties. In that prayer the bondholders join. It was stipulated that the cause be submitted on the pleadings, plaintiffs, however, objecting to the entry of a declaratory judgment. In response to the prayer of Pueblo and the bondholders the court entered findings of fact and conclusions of law, adjudging that plaintiffs take nothing, that they and the bondholders be enjoined from asserting rights against Pueblo contrary to the decree and that the parties pay their own costs. The bondholders accept the judgment and here join with Pueblo. To review that judgment plaintiffs prosecute this writ. We think their eight assignments are sufficiently covered by the first, i.e., that the court erred in holding that they had no cause of action.

Over a period of more than a quarter of a century Pueblo created some twenty-eight special improvement districts, of which twenty-four are designated as paving districts, apportioning benefits and assessments and issuing bonds accordingly. In 1938 many of these districts were in default. 1373 created a common fund consisting of the assets of all of said districts and issued its so-called refunding bonds, secured by said assets and payable only out of said fund, and exchanged these "dollar for dollar" for all outstanding indebtedness of said special improvement districts. Provision was presumably made for the preservation of prior existing liens and liabilities and continued separate accounting for each district. In addition to the assets of the special improvement districts it was further provided by 1373 that the "refunding improvement bond fund," hereinafter referred to as the bond fund, should, when necessary, be augmented by the annual levy of a general tax on all the property in Pueblo not to exceed three mills. Accordingly in October, 1940, a levy of .04 mills was made to pay the interest and principal of said refunding bonds. To that levy this suit in injunction was directed.

4

The refunding bonds recited that Pueblo "for value received, hereby promises to pay to the bearer hereof, out of the special fund [bond fund] hereinafter designated, but not otherwise the sum of * * *." There was no equality of failure to meet their obligations among the defaulting districts and apparently no default on the part of some included. The districts had been organized, their bonds issued and sold, and their improvements completed as by Constitution, statute and charter provided. Pueblo as a whole owed no obligation, moral or financial, to the holders of said bonds. They were issued without a vote of the electors. Their sole security was the obligation of Pueblo to levy, collect and pay over the assessments provided and, in case of default to proceed as by law provided. Under the refunding scheme Pueblo took over a portion of these obligations and assumed a portion of these liabilities to the bondholders. She forced taxpayers in a district slightly in default, to share with those in a district hopelessly swamped. She forced those in solvent districts, and those who had paid all their assessments, to shoulder a portion of the burdens of their less fortunate neighbors, and she compelled those who had never assumed any of said obligations, if such there were, to come to the relief of the more progressive, or more prodigal, who had. Thus the entire plan stands stripped of equity and we have but to inquire if it be clad in the vestments of the law.

Plaintiffs invoke certain federal and state constitutional provisions which they assert have been violated. Pueblo, a home-rule city organized under chapter XX of our Constitution, denies such violations and asserts that the power exercised in the enactment of 1373 relates solely to a local and municipal matter; that by said chapter XX all such powers were vested in her; that the powers so conferred included every power which the legislature was therefore authorized to grant; and that under the decisions of this court every power

so conferred was, if not withheld by her charter, vested in her legislative body, i.e., her city council.

■ For the purpose of this decision we observe first, that constitutional questions are not decided by the courts save in case of necessity, and second, we assume the correctness of the contentions otherwise made by Pueblo as above.

■ ■ In our opinion it becomes unnecessary to go into the numerous ramifications of the very able arguments, or attempt to examine and differentiate the interesting and important authorities cited. So vast is the scope of the authority here contended for by Pueblo, and so subject to abuse without recourse by those injured, that courts would not be disposed to uphold it in the absence of the clearest showing of its legality. We think it unnecessary to go further to test the existence of this power than to the charter of Pueblo itself, which is its constitution and to which its ordinances must conform. Not only do we find no specific grant therein of any such power to the city council, but we think that document definitely withholds it.

It was originally contended by the bondholders in their answer that 1373, and the refunding bonds issued thereunder, specifically imposed upon Pueblo the duty to make the levy herein questioned and similar levies in future years. Since the trial court held against that contention and the bondholders have accepted that judgment, we find it unnecessary to express any opinion thereon. That the question is one of moment, however, is clearly indicated. 1373 asserts that the original improvements were in fact for the benefit of the city at large and improvements for the construction of which it might have levied an annual tax on all the property in the city. That assumption is violent and there is no evidence of the fact in the record. The city also asserts that it is morally obligated, which is certainly doubtful, and if true carries with it no legal obligation. It is further therein recited that the bond fund shall consist of

the assets of the special improvement district "plus such part of the three mill levy authorized by said section 12, article IV of the city charter, *if such levy may be necessary,* as will be sufficient each year to pay bonds issued hereunder and interest thereon." The bonds themselves recite that they are payable solely out of said fund, constituted as above, plus "the proceeds of such part of the three mill levy authorized by section 12, article IV of the city charter, *if such levy may be necessary,* as will be sufficient to pay this issue of bonds and the interest thereon, * * *." It is further recited in the bonds that the city will maintain the fund, including "the proceeds of said tax levies, and out of said fund and as an irrevocable and prior charge thereon, will pay this bond * * *." Section 5 of 1373 likewise provides that, "commencing with the year 1938 *and each year thereafter* until all refunding improvement bonds issued and the interest thereon, shall be paid in full the city *shall, if necessary,* levy a tax on all the taxable property of the city, which tax shall never exceed three mills per annum, the proceeds of which, together with the other amounts in this section specified, shall be sufficient to pay all refunding improvement bonds issued hereunder, with interest thereon, in the amounts and at the times as nearly as may be as follows;" Here follows a list of the annual payments required beginning with $147,000 in 1939 and ending with $20,000 in 1953. Section 12, it is true, sets forth the hope that it may never be necessary "to levy any part of said three mill tax to comply with the provisions hereof," a hope unjustified by the experience of many years. Section 13 provides that when all the refunding bonds are paid any proceeds from the various sources remaining in the fund shall be turned over to Pueblo and "be used or credited as the city council may then determine," a provision upon which time and experience puts the stamp of futility.

While relieved of the necessity of determining the

obligation of the city to make the questioned levy, had the bondholders persisted in asserting and the city in denying it, we cannot close our eyes to the construction which the city by its conduct has put upon the language hereinbefore quoted. It has made a levy and asserts that it is its intention to continue to make annual levies accordingly as necessity may require.

We turn now to section 8 of article IX of Pueblo's charter which reads in part: "No contract of any kind or character, except bonds or franchises or contracts for the construction or acquisition of public buildings or works *which have been authorized by a vote of the electors of the city* as provided by this charter, shall be made or entered into by or on behalf of the city which is not by its terms to be fully performed within three months after the January first following the next general city election." By interpreting the closing proviso of that section as applicable only to each annual levy as made, the city seeks now to escape the prohibition thus clearly imposed. The limitation is unjustified. If the prohibition applies to one annual levy it applies to all, and the city's agreement is a continuing one. No particular levy can be segregated and exempted.

It is further contended that 1373 and the bonds thereunder issued constitute no contract on the part of the city. We are unable to follow the argument. It is said that without 1373 the city council might have done everything it has done in lumping these assets, pooling these debts and covering them with these refunding bonds. Then why the ordinance? The argument seems to us to answer itself.

Counsel for Pueblo and the bondholders appear to realize the peril in which 1373 is entangled by said section 8, supra, and invoke as its savior our opinion in *Montgomery v. Denver,* 102 Colo. 427, 80 P. (2d) 434. In fact Pueblo frankly admits that her plan here in question was evolved in an effort to comply with the law as therein announced. If, as we believe, she is in

error in that position we think the plan indefensible upon any theory. Hence we find it unnecessary to examine any other of the several authorities cited.

In the Montgomery case the issue was the validity of a levy authorized by an ordinance ostensibly to carry out a plan based upon a charter provision. There, however, Denver had not gone through the pretense of issuing refunding bonds. Its levy was to pay the originals. The notable distinction between that case and this is that 'Denver had a *charter provision,* section 48, adopted by the electors, which authorized *temporary advances* from general funds to meet maturing special improvement bonds. That, however, could only be done when four-fifths of the outstanding bonds of the district had been "paid and cancelled." We need not here set forth the various claims made by Denver in support of the questioned levy. Suffice it to say they were all swept away, save as specifically authorized by charter, as follows: "We are confident that the Denver city council * * * has no general authority as a matter of public welfare or otherwise, to levy a general tax to pay defaulted portions of special improvement district bonds, and, therefore, must conclude that in so far as the levy under consideration is devoted to the payment of such bonds or interest thereon in districts which have not discharged eighty per cent of their outstanding bonds it was unauthorized." Counsel for Pueblo and the bondholders conceded that we held, in that case, that charter limitations on an existing power must be observed by the city council. Here they have been ignored. There, specific authority to pay defaulted improvement district bonds was conferred by charter. Pueblo's charter confers no such authority.

It is contended that the power to do what is here attempted, being included in those granted to home-rule cities, is of necessity lodged in the city council, and that the Montgomery case recognizes this save as to such exceptions as may be specified in the charter. But the

Denver charter enumerates the conditions essential to support such action and says when these exist "then the city shall pay," etc. The clear implication is, and our construction there was, that the conditions specified being absent the council was powerless. Here the prohibition of said section 8 of article IX of Pueblo's charter is absolute.

Counsel contend that the questioned levy is authorized by certain language in section 12 of article IV of Pueblo's charter. That section specifically enumerates certain powers conferred upon the city council, authorizes the issuance of bonds "upon the vote of the taxpaying electors," and the levy of a general tax annually, not exceeding three mills, "to carry out any of said powers or purposes." We do not find a word in this section which in our judgment can reasonably be interpreted to apply to local improvements, already constructed and paid for, or the defaulted bonds of the districts chargeable.

We find it unnecessary to pass upon the success of the attempt to convert this action in injunction into a suit for a declaratory judgment over the protest of plaintiffs. They sought to enjoin the levy and Pueblo and the bondholders assert in their brief that the only question before us is the validity of the levy. Although the Montgomery case was an action for a declaratory judgment we declined to go beyond the question of levy, and as to other questions not directly involved left the parties "to proceed as they may be advised." Such appears the proper disposition here.

The judgment is accordingly reversed and the cause remanded to the district court with directions to vacate its decree, enjoin the levies, made and threatened, and proceed in harmony herewith.

Mr. Justice Hilliard not having heard the oral argument does not participate.