## No. 18,794.

### PUEBLO v. GRAND CARNIOLIAN SLOVENIAN CATHOLIC UNION OF THE UNITED STATES OF AMERICA.

(358 P. [2d] 13)

Decided December 19, 1960.

Mr. GORDON D. HINDS, Mr. WILLIAM L. LLOYD, Mr. FRANKLIN R. STEWART, Attorneys, Messrs. RHYNE, MULLIN, CONNOR AND RHYNE, Mr. CHARLES A. DUKES, JR., of Counsel, for plaintiff in error.

Mr. A. T. STEWART, Mr. V. G. SEAVY, for defendants in error.

Mr. JOHN H. GATELY, Amicus Curiae.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

IN the trial court the parties appear in reverse order to their appearance here. We refer to Grand Carniolian Slovenian Catholic Union of the United States of America as "Union" and to the City of Pueblo as the "City."

To better understand and resolve the question presented by this writ of error, some of the background material antedating the bringing of this action should be considered.

From the record before this court it appears that during the period 1917 to 1938, the City of Pueblo, a home rule city, had created twenty-eight paving districts and caused paving to be laid therein. In order to finance the cost of the construction, Pueblo had caused to be issued and disposed of special improvement bonds of each district. The bonds, some bearing 5% interest, others 6% interest, were payable out of assessments levied against the properties abutting on or adjacent to the paving projects.

Due to adverse economic conditions existing in Pueblo during the 20s and early 30s, owners of much of the property assessed with the costs of the paving improvements were unable to pay their assessments. Others failed to pay because their assessments exceeded the values of their properties. For these and other reasons collections of assessments fell far short of interest and redemption requirements, the extent of the shortages varying from one district to another.

By the year 1938 all twenty-eight districts were in arrears in the payment of interest or the redemption of bonds, or both; there had been much litigation involving the propriety and legality of assessments, alleged failure of the City to perform its duties, etc. As a result, the general credit standing of Pueblo had been seriously impaired; the City, the bondholders and the property owners subject to assessment were equally unhappy with their respective plights.

8

In an effort to remedy the chaotic condition then prevalent, the City, on October 26, 1938, adopted Ordinance No. 1373, which provided for the refunding of all of the bonds of the twenty-eight districts then outstanding; the bonds of the twenty-eight districts were to be accepted in exchange for refunding bonds bearing 4% interest. The refunding bonds were to become due and payable November 1, 1953. Refunding bonds were issued in the total amount of $879,000.00 and the same given in exchange for all of the outstanding bonds of the twenty-eight districts. As of February 28, 1952, the date of the original filing of this action, refunding bonds totaling $414,000.00 had been redeemed, leaving refunding bonds with a face value of $465,000.00 unredeemed.

Ordinance No. 1373 provided that the refunding bonds and interest thereon should be paid from the "Refunding Improvement Bond Fund":

"Said Refunding Improvement Bonds and the interest thereon shall be payable in regular numerical order out of a fund hereby created and designated 'Refunding Improvement Bond Fund' which shall contain the receipts from paid and unpaid assessments levied against property in districts, the bonds of which are to be refunded as herein provided, plus paid and unpaid interest and penalties on said assessments, plus the proceeds derived and to be derived from the sale of tax certificates and property now and hereafter held by the City for delinquent assessments on said Districts, * * *."

In other words, the refunding bonds and interest were to be paid out of a fund made up of: (1) receipts from paid and unpaid assessments of the twenty-eight districts; (2) paid and unpaid interest and penalties on such assessments; (3) proceeds derived and to be derived from the sale of tax sale certificates on property now held by the City for delinquent assessments; and (4) *such receipts as may be derived from a general tax levy, not exceeding 3 mills, as might be assessed against*

*all property in Pueblo, as provided by Section 12, Article IV, of the Pueblo City Charter.*

This ordinance contained adequate provisions for the redemption of all of the refunding bonds prior to maturity. However, Pueblo's paving problems were not at an end.

In October 1940, pursuant to Ordinance No. 1373, Pueblo undertook to levy a tax of .04 mills against all taxable property in Pueblo, the proceeds to go to the Bond Fund as above provided. Certain property owners brought suit to enjoin the levy of this tax and to have the mill levy provision of the ordinance declared void. They were successful in their contention that this provision of the ordinance providing for a general tax levy was void. *Flanders v. Pueblo*, 114 Colo. 1, 160 P. (2d) 980. Thus Pueblo was left with a refunding ordinance *which did not make adequate provision for redemption of the bonds.*

After meeting this setback, *Flanders v. Pueblo* (May 21, 1945), Pueblo undertook to carry on under Ordinance No. 1373, as emasculated. The bread and butter revenue provision of the ordinance having been eliminated, they were doomed for failure. A flood of litigation followed. Bondholders and property owners subject to assessments were equally critical of Pueblo and its efforts in their behalf. None were getting the relief contemplated by Ordinance No. 1373 prior to its emasculation.

Union on February 28, 1952, brought a class action in behalf of itself and all other holders of refunding bonds issued pursuant to Ordinance No. 1373 adopted by the City on October 26, 1938. In this suit Union sought to have a receiver appointed for the purpose of marshaling and distributing to the holders of refunding bonds all assets set up by Ordinance No. 1373 for the purpose of paying interest upon and redeeming said bonds so issued. On February 28, 1953, a receiver was appointed for such purposes and ever since said date he has been and is now so functioning.

Soon after the appointment of the receiver differences arose between the receiver and the City as to the rights and duties conferred and imposed upon the bondholders and the City by Ordinance No. 1373. Some of those disputes have been resolved and the resolution thereof accepted by both. One specific question has been in dispute since April 1954 and that is over the question whether the City is answerable for its actions or failures to act with reference to the twenty-eight original paving districts prior to the adoption of Ordinance No. 1373, adopted October 26, 1938, or is it answerable only to the extent of accounting to the receiver for the actual assets enumerated in the ordinance and held by the City in its fiduciary capacity.

Seeking to have this dispute resolved, the receiver, on April 24, 1954, filed a petition with the trial court in which he requested a court order:

"1. That Pueblo, a municipal corporation, be required to furnish the Receiver heretofore appointed with a detailed statement of all moneys received and disbursed by Pueblo, a municipal corporation, as trustee, in the above entitled matter.

"2. That Pueblo, a municipal corporation, furnish your Receiver with a complete list of all Treasurer's Certificates of Purchase received by Pueblo that have not heretofore been assigned to the Receiver by Pueblo, a municipal corporation.

"3. That Pueblo, a municipal corporation, furnish your Receiver with (a) a list of all Treasurer's Certificates of Purchase sold by Pueblo; (b) a list of all certificates of Purchase redeemed by the owners of the property upon which the certificates were issued; (c) a list of all Certificates of Purchase compromised by the City for less than the face value plus interest, and the date of compromise and the amount received.

"4. That Pueblo, a municipal corporation, furnish your Receiver with a detailed description of all real estate obtained by the City of Pueblo by tax deed or other-

wise on which have been issued Treasurer's Certificates of Purchase to the City of Pueblo as Trustee of the Refunding Bond issue and the dates when purchased."

On April 28, 1954, the trial judge sustained this petition and ordered the City to furnish the requested information. Due to various extenuating circumstances this information was not promptly furnished and many hearings and postponements were had. On December 10, 1957, after further arguments the trial court made rather exhaustive findings, some of which dealt with matters not before the court, and directed the receiver:

" * * * to take appropriate action in accordance with the findings made herein."

The City by timely and appropriate proceedings sought to have the findings and judgment altered and amended. This effort proved fruitless, whereupon the City sued out this writ of error.

The parties agree that the judgment of December 10, 1957, is a final judgment and appealable, and we so treat it.

The following, we believe, is a fair statement of the question propounded to and resolved by the trial court and now by writ of error presented to this court for answer:

IS PUEBLO UNDER THE PROVISIONS OF ORDINANCE NO. 1373 OBLIGATED TO ACCOUNT FOR ALL OF ITS ACTS OF OMISSION OR COMMISSION WITH REFERENCE TO THE AFFAIRS OF EACH OF THE TWENTY-EIGHT PAVING DISTRICTS FROM AND AFTER THE RESPECTIVE DATES OF THEIR CREATION, OR IS IT ONLY OBLIGATED TO ACCOUNT FOR THE CASH ON HAND, TAX SALE CERTIFICATES ON HAND AND PROPERTIES ACQUIRED PRIOR TO 1938 AND ITS ACTS SUBSEQUENT TO 1938?

Having in mind the foregoing background, it seems likely that the holders of bonds in the twenty-eight defaulted districts and the City intended to start anew

rather than to perpetuate over twenty years of past frustration. As pointed out, the 1938 ordinance made ample provision for meeting all of the obligations of the refunding bonds — even if nothing were received from unpaid assessments, sale of tax sale certificates or properties deeded to the City, the mill levy provision of the ordinance afforded ample assurance that all obligations would be met and paid. There can be little, if any, doubt of the fact that this mill levy provision of the ordinance loomed large as an inducement to the holders of old bonds to exchange them for the new.

Holders of old bonds in accepting bonds with a lower interest rate and a later maturity date must have contemplated getting something different and better than that which they had. By the same reasoning, the City in assuming new and greater obligations must have contemplated some advantages for itself and that consisted of a lower interest rate, deferred maturity dates and relief from answerability for its actions or omissions to act prior to October 24, 1938.

The fact that the mill levy provision of the ordinance was, on May 21, 1945, held unconstitutional and as a consequence thereof anticipated revenue for payment of interest and redemption of bonds was not forthcoming from that source sheds no light on the October 26, 1938, intention of the parties, when Ordinance No. 1373 was adopted and new bonds issued in exchange for the old.

To hold, as the trial court did, that the adoption of Ordinance No. 1373 did not define the rights and duties of the City and bondholders who surrendered their old bonds in exchange for 1938 refunding bonds, would defeat the very purposes of the refunding operation.

The judgment of the trial court is reversed and the cause remanded with directions to the trial court to set aside and vacate any and all orders entered directing the City to answer for anything prior to October 26, 1938. By the same reasoning, we hold that the City is precluded from making claim against the receiver for

any claims that it may have arising prior to October 26, 1938.

We note that the receiver has been functioning for nearly eight years and, though he has been confronted with numerous complex problems, it would seem that with this present problem resolved he could and should bring his stewardship to an early end so that the City, bondholders and property owners may be freed of the uncertainty of their respective rights and duties in the matter.

MR. CHIEF JUSTICE SUTTON, MR. JUSTICE FRANTZ and MR. JUSTICE DOYLE specially concur.

MR. JUSTICE MOORE, MR. JUSTICE KNAUSS and MR. JUSTICE DAY dissent.

MR. CHIEF JUSTICE SUTTON specially concurring:

I concur in Mr. Justice Hall's opinion. However, I have additional reasons and I would also answer the question of jurisdiction *vel non* raised by this court *sua sponte* and which forms the basis of Mr. Justice Moore's vigorous dissent.

The principal thesis of the dissent is that the act of the trial court in appointing the receiver resulted in an all time void receivership. With this concept I cannot agree for reasons which more fully hereafter appear.

It has been urged by Mr. Justice Frantz that improvement district funds are not public funds within the true meaning of the constitutional and statutory provisions governing elected public officials and the various funds they handle; that a more proper theory is one of agency or trusteeship. With this concept I can agree. See authorities cited in Mr. Justice Frantz's specially concurring opinion. Here they certainly are neither fish nor fowl.

I urge in addition, however, that here the question of jurisdiction is moot.

14

Mr. Justice Doyle in his specially concurring opinion suggests that the power to appoint such a receiver has been bestowed by statute in other jurisdictions, that we should thereby recognize that a gray area exists here and that in effect the equities of this case require us not to undo what we and the parties have so long acquiesced in.

The record and briefs here disclose that as a result of the decision in *Flanders v. Pueblo* (1945), 114 Colo. 1, 160 P. (2d) 980, other litigation followed in this controversy and that in 1952 Grand Carniolian brought a class action seeking appointment of a receiver to marshal and distribute the assets held under Ordinance No. 1373. Pueblo resisted that action, but the trial court on February 28, 1953, appointed this receiver as a result of its hearings. Following the appointment Pueblo sued out its writ of error seeking reversal (Case No. 17,059). On February 1, 1954, this court announced its opinion in case No. 17,059 wherein it determined the trial court had no jurisdiction to appoint a receiver. Among authorities cited were: *State of New Mexico, ex rel. Lynch v. District Court of McKinley County,* 41 N.M. 658, 73 P. (2d) 333, 113 A.L.R. 746; *Thompson v. Allen,* 115 U.S. 550, 29 L. Ed. 472; and *Yost v. Dallas County,* 236 U.S. 50, 59 L. Ed. 460.

On the date the opinion of this court was announced in Case No. 17,059, the City Council of Pueblo adopted Resolution No. 498, which expressly authorized and directed its city attorney "TO DISMISS THE CITY'S APPEAL TO THE SUPREME COURT FROM A RECEIVERSHIP GRANTED BY THE DISTRICT COURT PERTAINING TO ASSETS OF THE REFUNDING IMPROVEMENT BOND FUND." Pursuant to resolution the announced opinion was withdrawn and the writ of error dismissed, therefore the order of the district court appointing the receiver became final and is *res judicata* unless the court lacked jurisdiction. I now repeat that Mr. Justice Moore's point is that there was no jurisdic-

tion. My point is that at this date that is an immaterial matter due to what happened after the dismissal of Case No. 17,059.

I certainly agree that it is fundamental that jurisdiction cannot be conferred *upon a court* either by consent or stipulation. *Brooke v. People* (1959), 139 Colo. 388, 394, 339 P. (2d) 993; *McCoy v. McCoy* (1959), 139 Colo. 105, 110, 336 P. (2d) 302, 305; *Davidson Chevrolet v. Denver* (1958), 138 Colo. 171, 175, 330 P. (2d) 1116, 1118-19; *Avery v. County Court* (1952), 126 Colo. 421, 425, 250 P. (2d) 122, 124; *U.S.F. & G. Co. v. Ind. Com.* (1936), 99 Colo. 280, 282, 61 P. (2d) 1033, 1034; 75 C.J.S. Receivers, §35 (1952); 1 *Clark Receivers,* §302 (1959).

Up to now it has always been considered fundamental that courts cannot appoint receivers to collect *public* taxes or otherwise interfere with the constitutional functions of other independent branches of government. *Lynch, Allan, and Dallas County,* supra.

I even suggest at this late date that the proper remedy for the bondholders to have used to compel Pueblo as a trustee to perform its fiduciary functions was mandamus. *Paducah v. White* (1932), 244 Ky. 733, 51 S.W. (2d) 935; 34 Am. Jur. 904, §122.

This is so because it has been held that "In the absence of legislation neither the federal nor the state courts possess power to appoint receivers for insolvent local political subdivisions of a state." *City of Enterprise v. State* (1937), 156 Ore. 623, 69 P. (2d) 953; also see 45 Am. Jur. 74, §79. The recognition of this rule, and that of the constitutional separation of powers, by appellate courts is generally *based upon those cases where there has been an interference with the governmental functions of non-judicial branches of government.* It is for this reason that I can not follow Mr. Justice Doyle's suggestion of a basis for decision in this case.

It is my position that we are faced with the questions as to whether: (1) the appointment and acts of *this re-*

*ceiver* are in fact an interference with the exclusive governmental functions of other branches of government (which I have noted was not earlier considered by this court), and, (2) if so, whether the receiver could nevertheless proceed on the theory of estoppel or waiver as to Pueblo as the result of Pueblo's conduct.

Examining the latter question first it is recognized in Colorado that estoppel does not operate against the government acting in its *public* capacity. *Bennetts, Inc. v. Carpenter* (1943), 111 Colo. 63, 137 P. (2d) 780. However, a state or its subdivisions may waive sovereign immunity as well as other rights. 56 Am. Jur. 113, 511; cf. 49 Am. Jur. 313, 396.

Here the fact situation discloses that the receiver had no authority to levy or collect taxes or to perform other governmental functions; nor was he authorized to perform the duties of any elected official. His attempted appointment by a court of general jurisdiction extended no further than to marshal and distribute taxes and other assets already collected. His duties were and are those of a private trustee appointed under the long recognized equitable powers of the courts.

Though the law is that generally a court of equity cannot appoint a receiver to perform even non-governmental functions when insolvency involves a local political subdivision (*State,* supra) and that estoppel (*Carpenter,* supra) does not operate against the state, nevertheless the facts of the instant case compel a different answer, particularly in view of the doctrine of waiver.

We cannot be blind to the reality that here we are dealing with funds which are in fact not public funds but trust funds owned by the bondholders and that Predovich was actually the *agent* of Pueblo in dealing with these assets. Though his appointment was at first resisted, *the fact is that Pueblo, the local subdivision of government, charged as trustee with the proper administration of this fund, by its action in Case No. 17,059,*

*advocated, ratified and approved the appointment of a receiver as a substitute trustee.* Thus the appointment was in fact Pueblo's appointment and his acts were and are those of Pueblo. He was no longer a *pseudo receiver* presuming to act under a void court order but was a *de facto trustee and agent* though nominally called a receiver, but the appellation makes no difference; it is what he did for whom that matters. He was a coordinator, a centralized city agent to whom both the bondholders and Pueblo could look in order to have the tangled web of finances unravelled. His initial appointment by the court, although invalid, is nevertheless effective as to Pueblo by reason of its acceptance of him as its own agent to do for it that which as trustee it was bound to do.

The exact nature of the legal status can be defined as an agency by estoppel because it was not an express delegation of power to Predovich, and because it was not a public function in the sense of having the exclusive functions of an elected official performed by the receiver.

The legal relationships of this latter type of agency are clearly set forth in *Siegel Campion Live Stock Comm. Co. v. Arhdohian* (1922), 71 Colo. 410, 207 Pac. 82, in which it is stated:

"An agency by estoppel is apparent but not real. It is created by operation of law and established by proof of such acts of the principal as reasonably lead to the conclusion of its existence. *Created for the protection of him who has in good faith relied upon it* the acts of the principal which support it must, at the time of transaction, been known to him.

" * * *.

"*A principal may bind himself by causing others to believe the agent's authority to be greater than actually exists,* but such acts by the principal must be known to and proved by the party relying thereon. He cannot

claim reliance upon what he did not know." (Emphasis supplied.)

See also *Moore v. Switzer* (1925), 78 Colo. 63, 239 Pac. 874, in which it was stated "Authority by estoppel is not actual but apparent only, and is imposed on the principal because his conduct has been such as to mislead, so that it would be unjust to let him deny it."

The City of Pueblo has for many years permitted and encouraged Predovich to perform the city's duties as trustee of this fund, and the bondholders have come to rely upon their knowledge of such fact and deal with him accordingly. I contend they had that right. The City thus is estopped to deny the agency of Predovich. It does not deny it, however, going so far in its brief in the current action as to say that it " * * * WILL RATIFY THE RECEIVER'S ACTIONS INSOFAR AS HE ACTED PROPERLY." In effect, it thus is acknowledging the existence of the agency because by offering to *ratify* acts, which must be acts of an individual acting on its behalf as its agent, it necessarily could only approve those which it had had the authority to grant to an agent to perform.

Under the facts of this case the act of Pueblo and its presently stated intention to ratify the acts of one who now turns out to be its agent "INSOFAR AS HE ACTED PROPERLY" impels the conclusion that his agency must be retroactive and effective to the date of his original appointment by the court.

I advert next to the initial question before us in the present proceeding. This is whether the so-called receiver, as Pueblo's agent and trustee, can go behind the adoption of Refunding Ordinance No. 1373 and require his own principal to account for long past actions? Though I agree with Mr. Justice Hall's contention, I again feel compelled to add an additional reason which buttresses his results.

The extent of an agent's authority to act must be found in an express delegation by his principal or by

necessary implication in the power delegated. *Nippel v. Hammond* (1878), 4 Colo. 211. Though this agent is a trustee he is also Pueblo's *alter ego*. If, as it has emphatically indicated by these proceedings, Pueblo did not authorize its agent and trustee to investigate the matters in question, due in effect to impossibility of performance in accounting for matters occurring more than 22 years ago, it cannot be made to do so by its own employee.

Again I observe that if it had been proper for the bondholders at this late date, which I do not infer to be the case here due to laches and election of remedy, to compel such an accounting, the proper remedy would have been in *mandamus*. Having elected their remedy by class action, and having instituted and been a party to earlier proceedings, the bondholders must now be precluded from reaching through the hands of this so-called receiver, who is really the City's trustee, for the relief they seek. This is as it should be for litigation must have an ending.

I agree with the reversal for these additional reasons.

MR. JUSTICE FRANTZ specially concurring:

I would briefly state my reasons for specially concurring. These reasons involve the nature and purpose of assessments for improvements and of the fund created by the legislation establishing the entity, whether an improvement district, irrigation district, or other similar agency.

We are not dealing here with a public fund in its true sense. "The term 'public funds' means funds belonging to the state." *Pensioners Ass'n v. Davis,* 112 Colo. 535, 150 P. (2d) 974. The Refunding Improvement Bond Fund, so described in the ordinance under consideration, is not a fund belonging to Pueblo; the city "was a trustee of the assessment funds, acting for the bondholders, who were the cestuis que trustent." *Haxtun v. Wangnild,* 109 Colo.

20

518, 127 P. (2d) 328; *Wangnild v. Haxtun,* 106 Colo. 180, 103 P. (2d) 474.

It must be borne in mind that the nature of a public fund derives from the type of exaction that is imposed to form the fund. Taxation "is that burden or charge upon all property laid for raising revenue for general public purposes in defraying the expense of government. Assessments are local and resorted to for making local improvements on the theory that the property affected is increased in value at least to the amount of the levy." *Denver v. Tihen,* 77 Colo. 212, 235 Pac. 777. Assessments do not impose a personal liability; the liability is in rem, resting upon, and only upon the property benefitted. *Rupp v. City of Tulsa,* 202 Okla. 442, 214 P. (2d) 913. See *Interstate Trust Co. v. Montezuma, etc., Dist.,* 66 Colo. 219, 181 Pac. 123.

Cities "in issuing and negotiating local improvement bonds, act merely as an *agency; not of the city* but as special agents of the improvement districts, to accomplish a public end." (Emphasis supplied.) *Sanborn v. Boulder,* 74 Colo. 358, 221 Pac. 1077; *Sterling v. Commercial Savings Bank,* 116 Colo. 369, 181 P. (2d) 361. They are trustees acting for the bondholders. *Haxtun v. Wangnild,* supra. They are conduits for the disposition of funds not in a true sense of a public nature.

"The remaining question is: Was the court without jurisdiction to appoint a receiver? We can discover no objection to the receivership on jurisdictional grounds. The funds in the hands of the dental board are not public funds in any sense of the word." *Stern v. State Board,* 50 Wash. 100, 96 Pac. 693. See *Wilder v. City of New Orleans,* 67 Fed. 567, involving the appointment of a receiver over a drainage fund.

We are not divesting the city of the administration and disbursement of public funds by recognizing as valid the appointment of a receiver to act in its stead. These funds do not become a part of the treasury of the city for the purpose of defraying the expenses of city govern-

ment; they never become the property of the city; they are held for the use of the bondholders. There is, therefore, no invasion of the functions of one branch of government by another.

Believing as I do regarding jurisdiction, I concur in the opinion of Mr. Justice Hall.

MR. JUSTICE DOYLE specially concurring:

I concur in the majority opinion and have no additional comments on the subjects treated therein. I consider it necessary, however, to comment briefly on the question whether a court has power to appoint a receiver for the purpose of exercising administrative functions.

This question was presented to the Court in the year 1954 soon after the receiver was appointed. An opinion which ruled that the Court lacked jurisdiction was announced on February 11, 1954. Later the city, acting pursuant to a resolution of the Pueblo City Council, requested dismissal of the writ of error. On this basis the opinion was withdrawn. Since then the receiver has been acting with the full approval of Pueblo. The City of Pueblo did not raise the issue of voidness in connection with the present writ of error. It was only after the several questions had been presented that this Court *sua sponte* demanded that briefs be filed and that hearings be had on this subject.

If the matter were clearly a question of jurisdiction, it would not be possible for either the parties or this Court to breathe life into this receivership and I for one would not advocate that we adopt such an unconstitutional course. I am not convinced, however, that the subject matter under review has this character. My research has uncovered cases which recognize that the legislative branch can invest the judiciary with power to appoint receivers in circumstances like the present ones. See the cases collected in 113 A.L.R. 746 and see

particularly *Warrenville State Bank v. Farmington TP.,* 81 Fed. Supp. 101, wherein the Court said:

"Here, the parties agreed by contract to the appointment of a receiver in case of a default in bond and interest payments. This eventuality has occurred and the bondholders seek enforcement of the only adequate remedy to protect their rights under that contract. They should have it."

Suppose in an extreme fact situation that the administrative department should collapse completely to the disadvantage of particular citizens and the public at large. Would a court of equity be powerless to appoint a temporary custodian of the duties of this department? I think not. If the exercise of power were fundamentally violative of the separation of powers principal, the attempted exercise would be void under all circumstances.

In the case at bar the City of Pueblo consented to the exercise of authority by the receiver over a period of years, and thus it is tantamount to authorization by statute or contract. Certainly it has been a consensual arrangement.

In view of these considerations, it would be highly inappropriate for this Court, acting on its own motion, to declare everything null and void and of no effect. Such an irresponsible action on our part would produce great hardship and complexity.

I emphatically agree with Mr. Justice Hall's suggestion that the mission of this receiver be completed at the earliest possible time consistent with my viewpoint that it is legally possible to have a receiver under extraordinary conditions for a limited period of time.

MR. JUSTICE MOORE dissenting:

I respectfully dissent. The opinion approved by the majority of the court makes no mention whatever of an issue which is of first importance in the determination of the validity of any judgment. That issue in the instant

case is whether the trial court at any time had jurisdiction to appoint a receiver to perform the duties which by valid legislative enactment are placed exclusively in the executive branch of the government. Full oral argument was ordered by this court on that issue alone, and comprehensive briefs have been submitted by counsel. It should not be by-passed on grounds of expediency.

The appointment of a receiver under the facts disclosed by the record here, either was or it was not, a proper exercise of judicial power. The constitution of this state provides for a separation of the powers of government into "three distinct departments." It commands that, " * * * no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, * * *."

Is the majority opinion to become a precedent by which this court will evade its duty and by-pass a basic constitutional limitation upon the exercise of judicial power, if by so doing a result might be achieved which seems expedient under a given set of facts? Expediency should never prompt this court to cast doubt upon the soundness or vitality of that basic concept of our system of government which prohibits any one of the separate branches thereof from usurping powers "properly belonging to either of the others."

In the instant case the duties and obligations of the City of Pueblo and its officers who are charged with the responsibility of administering and disbursing the Refunding Improvement Bond Fund can only be found in the provisions of Ordinance No. 1373 and the applicable statutes of this state. None of these enactments provide for the appointment of a receiver at the instance of a bondholder.

In the absence of a statute, or a provision in the bonds so providing, a court does not have jurisdiction to appoint a receiver to collect, marshal and distribute special improvement tax funds to bondholders. To hold other-

wise is to recognize a power in the courts to appoint receivers for any agency of government. Such a result would be subversive of the basic principles upon which our government is founded.

A case in many essentials identical with the instant action is *State of New Mexico, ex rel. Lynch v. District Court of McKinley County,* 41 N.M. 658, 73 P. (2d) 333, also reported in 113 A.L.R. 746, where the leading au-·thorities are reviewed. In the course of its opinion the court observed:

"After careful consideration of the authorities and argument of the respective parties, we feel constrained to hold that the respondent [District Judge] exceeded his jurisdiction in the appointment of a receiver to take over and administer the town of Gallup."

In *Thompson v. Allen County,* 115 U.S. 550, 29 L. Ed. 472, it is said that there was no more reason to hold that the collection of taxes already assessed is a function of a court of equity than the levy or assessment of such taxes.

In *Yost v. Dallas County,* 236 U.S. 50, 59 L. Ed. 460, the court said: "It is impossible for the courts to substitute their own appointee in place of the one contemplated by the act." To the same effect is *Paducah v. White,* 244 Ky. 733, 51 S.W. (2d) 935; *City of Enterprise v. State,* 156 Ore. 623, 69 P. (2d) 953; *McMillan v. Board of Commissioners of Adams County,* 113 Colo. 387, 157 P. (2d) 146. See also 45 Am. Jur. 74, section 79.

It is no answer to the question to brush aside the issue on the ground that the parties themselves, at least for a time, agreed to the exercise of jurisdiction by the trial court in appointing a receiver. The law upon this point is very clear and is well stated in *McKinnon, et al. v. Hall, Adm'r.,* 10 C.A. 291, 50 Pac. 1052, in the following pertinent language:

"It seems to be assumed on both sides that because the parties consented that the case presented might be heard and determined by the court, upon the allegations

of the pleadings, and such evidence as might be introduced in their support, therefore the court was authorized to proceed to a hearing, and render its judgment on the merits of the case. But if the subject-matter of the litigation was outside of the jurisdiction of the court, its judgment is not aided by the consent given. The jurisdiction of courts is defined by the law, and where it does not legally exist, no consent of parties can confer it. *There was no suggestion of want of jurisdiction made in the district court, and none is made here, but where such want appears upon the face of the record we are compelled to notice it."* (Emphasis supplied.)

To like effect is *Whipple v. Stevenson, et al.,* 25 Colo. 447, 55 Pac. 188.

I am at a complete loss to understand how my brethren who make up the majority can reconcile the present opinion with that in *Davidson Chevrolet, Inc., et al. v. City and County of Denver,* 138 Colo. 171, 330 P. (2d) 1116, in which all members of this court concurred and where the court speaking through Mr. Justice Frantz said:

"A void judgment is a simulated judgment devoid of any potency because of jurisdictional defects only, in the court rendering it. Defect of jurisdiction may relate to a party or parties, the subject matter, the cause of action, the question to be determined, or the relief to be granted. A judgment entered where such defect exists has neither life nor incipience, and a court is impuissant to invest it with even a fleeting spark of vitality, but can only determine it to be what it is — a nothing, a nullity. Being naught, it may be attacked directly or collaterally at any time. *Stubbs v. McGillis,* 44 Colo. 138, 96 Pac. 1005, 130 Am. S. R. 116, 18 L.R.A. N.S. 405."

It is my firm opinion that the language last above quoted is a forceful and correct statement of the law. It is not something to be applied "willy-nilly." It is not "here today and gone tomorrow" depending upon how individual members of the court may think applying the

rule will affect the litigants. To countenance such a result is to abandon the concept of government by law, and to install government by an unrestrained appraisal of what is deemed expedient at the time.

I can have no part in the usurpation of power by any one of the three branches of the government and the consequent weakening of constitutional limitations upon authority of each. I sincerely believe that the majority opinion will ultimately lead to such result.

This court should remand the cause to the trial court with instructions to discharge the receiver.

MR. JUSTICE KNAUSS and MR. JUSTICE DAY join in this dissent.