2005 OK CIV APP 72

**Naomi MEDLOCK, Ralph Sanders, Charles Sanders, Sherry Wolfe, individuals, Plaintiffs/Appellants,**

v.

**ADMIRAL SAFE COMPANY, INC. and Rex Herd, an individual, Defendants/Appellees.**

No. 99,687.

Court of Civil Appeals of Oklahoma, Division No. 3.

Sept. 9, 2005.

Jerry D. Lundy, The Lundy Law Firm, P.L.L.C., Broken Arrow, OK, for Plaintiffs/Appellants.

John A. Gladd, Gladd & Smith, Tulsa, OK, and Gail W. Harris, Tulsa, OK, for Defendants/Appellees.

KENNETH L. BUETTNER, Chief Judge.

### Part I

¶1 On November 5, 1999, about 8 p.m., Defendant Rex Herd, proprietor of Defendant Admiral Safe Company, answered a telephone request to open a safe at Sanders Realty. Herd[1] called back twice to verify the request and to get directions. A young man greeted him and said his father needed some papers from the safe which had been working earlier that day, but no longer was. Herd opened the safe. The young man paid him with a company check. Later, Herd saw a Crimestoppers article about a theft from a safe at that address. He went directly to the police and was instrumental in having charges brought against the thief who was in fact Ralph Sanders' grandson and the nephew or cousin of the other Plaintiffs. The Plaintiffs sued Herd and his company for negligence and sought punitive damages. The matter was tried to a jury which found Plaintiffs 51% negligent. We affirm, but we reverse the award of attorney fees in favor of Defendants.

¶2 Herd testified that when he arrived at Sanders Realty, someone called out to him, "are you the locksmith?" Herd did not ask for identity because he felt that the two callbacks were sufficient. He remembered "Ralph Sanders" from the phone calls. After the criminal action, Herd knew that the younger man's name was Easley. Herd mentioned to Easley that his voice was different from the one he spoke with on the phone and Easley stated that the man Herd spoke with was his father who had to go to a meeting. Easley then stated that he had a company check with which to pay Herd and asked if that was okay.

¶3 Easley gave Herd three numbers which he said were the safe's combination. When Herd could not unlock it using his diagnostics, he drilled the safe open. At that time, Easley discovered two inner lock boxes. Easley asked Herd to open them as well when Easley was unable to reach his father by phone. As Herd was walking away, one of the doors of an inner lock box opened and he observed cash. The next morning, Easley called Herd and stated that the check was drawn on the wrong account. The following Monday, Easley came to Herd's business, retrieved the check and paid Herd in cash for his services.

¶4 Herd no longer worked as a locksmith, but testified that he still belonged to the professional organization and was familiar with the Code of Ethics of the Associated Locksmiths of America. There was no similar code for people who worked with safes and vaults, but he agreed that the same principles were good for that profession as well. The Code states that for service orders involving physical security, the following in-

---

**1.** The parties' briefs spell the name "Hurd," but because it was consistently spelled "Herd" during the trial, and more importantly, on the cap-

tion of the journal entry of judgment, we will also spell the Defendant/Appellee's name "Herd." Supreme Court Rule 1.25(b).

formation will be obtained before providing service: (1) positive identification of the ordering party; (2) establish and record a client's basis of authorization for ordering such work; (3) obtain a signature on an authorization/work order whereby a signatory assumes full responsibility and liability for ordering the work specified; and (4) retain records for three years.

¶ 5 Herd testified that he felt he made identification by the two call-backs, which was normal operation for him and that he had at that point established the basis of authorization. He had recorded it in his call book where he took service calls. He did not obtain any signature by the person for the work order where that person would assume full responsibility and liability and the only record he retained for three years was the receipt he wrote for the job which had an incorrect date on it. He did not suspect anything untoward that evening. "It comes down to taking in all the available information that you have and making a judgment call. When you are dealing with a con man, then you are up against things you don't think of being up against."

¶ 6 A police officer testified that when he interviewed Plaintiffs Naomi Medlock and Charles Sanders, aunt and uncle of Ralph Easley, his report stated that they were not surprised that it was their nephew who allegedly broke into the safe and that they suspected him from the beginning. They gave the officer information about him.[2] Easley knew the family had gone to Las Vegas that weekend. The grandfather, Ralph Sanders, had given him the key to his truck to use for moving. It is possible that Easley had a key to the Real Estate office. Charles Sanders denied suspecting Ralph Easley until the end of January 2000.

¶ 7 Testimony revealed that the safe contained cash, coins and jewelry. Some of the stolen property was recovered from Easley's residence and some of it was discovered in pawn shops. Plaintiffs did not present an exact inventory of the contents of the safe, but some of the items were not recovered. The Plaintiffs testified to the provenance of the inventory and its value. They also presented expert testimony with respect to value.

¶ 8 On June 26, 2003, in a nine-to-three vote after three days of trial, the jury returned a verdict finding Plaintiffs 51% negligent and Defendants 49% negligent. Nine jurors concurred in the determination that they did not find by clear and convincing evidence that Defendants acted in reckless disregard of the rights of others with respect to the punitive damages question. On July 21, 2003, the trial court entered an order overruling Plaintiffs' Motion for Judgment Notwithstanding the Verdict or, in the alternative, Motion for a New Trial. On that same date, the Court granted Defendants' Motion for Attorney Fees and Costs.

¶ 9 First, Plaintiffs contend that the trial court erred by overruling their Motion for Directed Verdict and their Motions for Judgment Notwithstanding the Verdict, or, in the alternative, for a New Trial on behalf of each Plaintiff. Title 12 O.S.2001 § 698 states in part:

*When a motion for a directed verdict made at the close of all of the evidence should have been granted, the court shall, at the request of the moving party, grant judgment in the moving party's favor, although a verdict has been found against the moving party, but the court may order a new trial where it appears that the other party was prevented from proving a claim or defense by mistake, accident or surprise. The motion for judgment notwithstanding the verdict, if made, must be filed not later than ten (10) days after the judgment, prepared in conformance with Section 696.3 of this title, is filed with the court clerk. A motion for judgment notwithstanding the verdict may be joined with a motion for a new trial.* (Emphasis added.)

Generally, when the basis for the challenge is sufficiency of evidence, a trial court may only grant a judgment notwithstanding the verdict when the moving party has made a previous motion for directed verdict at the

---

2. The family had learned that Easley was not attending college in Georgia as they believed, but was in fact on probation on eleven counts of burglary.

close of all the evidence. 46 Am Jur 2d § 120. Further, "[i]n a case involving more than one plaintiff or more than one defendant, each of the fellow coplaintiffs or codefendants must make a proper motion for a directed verdict at the close of all the evidence in order to be in a position to move for judgment notwithstanding the verdict." *Id.*

¶ 10 Initially, Plaintiffs want us to view the facts the way they see them. However, we are neither the thirteenth person on the jury nor may we ignore the standards set before us. "A motion for directed verdict raises the question of whether there is any evidence to support a judgment for the party against whom the motion is made, and the trial court must consider as true all the evidence and inferences reasonably drawn therefrom favorable to the non-movant, and disregard any evidence which favors the movant." *Gillham v. Lake Country Raceway*, 2001 OK 41, ¶ 7, 24 P.3d 858, 860. In *Century Investment Group, Inc. v. Bake Rite Foods, Inc.*, 2000 OK CIV APP 48, ¶ 2, 7 P.3d 510, 512, we cited *Handy v. City of Lawton*, 1992 OK 111, 835 P.2d 870, 872 for the principle that "[b]oth a demurrer and a motion for a directed verdict should be denied when there is a dispute of material fact or when reasonable minds could differ." We have recited enough of the evidence to show that Plaintiffs could not jointly prevail on their Motion for Directed Verdict for liability against Defendants. There was some evidence from which the jury could find contributory negligence on the part of one or more plaintiffs. Nonetheless, they now argue that two of the Plaintiffs, Sherry Wolfe and Charles Sanders, had no relationship with the direct cause of the opening of the safe or the theft, and that the motions should have been granted with respect to them. This position, however, is inconsistent with Plaintiffs' approach at trial, which was to treat the Plaintiffs as a group. Plaintiffs made a *pro forma* joint motion for directed verdict against Defendants at the end of all the evidence.[3] However, Plaintiffs did not individually or jointly move for directed verdict on the contributory negligence defense. In their Motion for JNOV and, in the alternative, for a New Trial, the four Plaintiffs made their allegations jointly, as one, except separated Sherry Wolfe for not having the ability to give access to the opened door to the building. Plaintiffs contend that Defendants' assertion that they were contributorily negligent failed to raise a single fact or inference showing Sherry Wolfe or Charles Sanders had been negligent. They also alleged two other 12 O.S.2001 § 651 grounds for new trial, which they have abandoned on appeal.[4]

¶ 11 Our constitution leaves the question of contributory negligence to the factfinder. "The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury." Okla. Const. Art. 23, § 6. In this case, because Plaintiffs did not move for directed verdict on the basis of no evidence to support the contributory negligence claim as to certain Plaintiffs, they did not meet the prerequisite of § 698, and therefore could not include the issue in their Motion for JNOV. There was no error in overruling that motion. In addition, "[a]n allegation of error in a motion for new trial must be based on an error preserved in the course of trial proceedings." *Capshaw v. Gulf Insurance Company*, 2005 OK 5, ¶ 13, 107 P.3d 595, 602. There is likewise no error in denying the motion for new trial.

---

3. Mr. Funk: Yes, Your Honor. We would ask for a directed verdict on liability for negligence on the part of Rex Herd and on the part of Admiral Safe Company.

The Court: The plaintiffs' motion for directed verdict on liability will be overruled.

4. 12 O.S.2001 § 651: A new trial is a reexamination in the same court, of an issue of fact or of law or both, after a verdict by a jury, the approval of the report of a referee, or a decision by the court. The former verdict, report, or decision, shall be vacated, and a new trial granted, on the application of the party aggrieved, for any of the following causes, affecting materially the substantial rights of the party:

1. Irregularity in the proceedings of the court, jury, referee, or prevailing party, or any order of the court or referee, or abuse of discretion, by which the party was prevented from having a fair trial; * * *

8. Error of law occurring at the trial, and objected to by the party making the application; . . . .

¶ 12 Plaintiffs generally objected to the instructions with respect to contributory negligence, there was no specific objection that the instructions, which discussed contributory negligence of the Plaintiffs as a group, should have been modified to require individual consideration of each Plaintiffs' conduct, no request for separate verdict forms, and no request for special findings, i.e. that the percentage of each Plaintiff's negligence, if any, be separately set forth. "In giving jury instruction, the trial court is not required to frame issues but it must state the law correctly." *Johnson v. Ford Motor Co.,* 2002 OK 24, ¶ 9, 45 P.3d 86, 90. Plaintiffs, in this court, do not argue that the contributory negligence instructions do not correctly state the law, but claim, as to certain plaintiffs, there was no evidence to support giving the instructions. They failed to point this out to the trial court, and thus did not give the trial court the opportunity to correct the mistake.[5] Thus, Plaintiffs failed to preserve any error with respect to the instructions.

¶ 13 Next, Plaintiffs allege that the jury erred by finding that they were 51% negligent. However, they re-argue the evidence and we do not have authority to re-weigh the evidence. As stated in *Barnes v. Oklahoma Farm Bureau Mutual Insurance Company,* 2000 OK 55, ¶ 3, 11 P.3d 162, 166, appellate review of a jury's fact-finding is quite circumscribed.

> In an action at law, a jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the verdict of the jury, [an appellate court] will not disturb the jury's verdict or the trial court's judgment based thereon. Where such competent evidence exits, and no prejudicial errors are shown in the trial court's instructions to the jury or rulings on legal questions presented during trial, the verdict will not be disturbed on appeal. In an appeal from a case tried and decided by a jury, an appel-

late court's duty is not to weigh the evidence and determine which side produced evidence of greater weight, i.e. it is not an appellate court's function to decide where the preponderance of the evidence lies— that job in our system of justice has been reposed in the jury. In a jury-tried case, it is the jury that acts as the exclusive arbiter of the credibility of the witnesses. Finally, the sufficiency of the evidence to sustain a judgment in an action of legal cognizance is determined by an appellate court in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it. (Citations omitted in the original)

¶ 14 For their third proposition of error, Plaintiffs state that the trial court erred by issuing prejudicial verdict forms and by not separating the Plaintiffs for purposes of the contributory negligence instructions. At trial, however, Plaintiffs objected to instructions with respect to contributory negligence on the basis that they believed the evidence did not support instructions on that defense. They objected to the white verdict form, but did not state the reason why. The white form divides liability between all Plaintiffs and all Defendants. The general objection was insufficient to advise the trial court that Plaintiffs objected to a group verdict and desired individual allocations. Thus, they failed to preserve any error regarding the verdict forms. With respect to alleged error in the verdict form, it cannot be interposed for the first time in a motion for new trial. Further, to be preserved for review by the appellate court, the aggrieved party must except to the flawed form at the pre-submission stage of the case, that is, at the same time as exceptions to the jury instructions. *Capshaw v. Gulf Insurance Company,* 2005 OK 5, ¶ 13, 107 P.3d 595, 603. Pursuant to 12 O.S.2001 § 588,[6]

---

5. "It is obvious that the purpose of requiring objections to instructions before reading them to the jury is to inform the court of any defect or irregularity in the content thereof in order that the court may be informed and correct any error therein." *McKee v. Neilson,* 1968 OK 102, ¶ 19, 444 P.2d 194, 199.

6. 12 O.S.2001 § 588: In all cases the jury shall render a general verdict, and the court may in any case at the request of the parties thereto, or either of them, in addition to the general verdict, direct the jury to find upon particular questions

the jury rendered a general verdict. Had Plaintiffs desired special findings of fact, it was up to them to request them. There was no reversible error with respect to the jury instructions.

### Part II

■ ¶ 15 Finally, Plaintiffs complain that the trial court erred when is sustained Defendants' Motion to Assess Attorney Fees and Costs. Before trial, Defendants filed an Offer to Confess Judgment for $50,000. Plaintiffs did not respond and failed to obtain judgment for an amount greater than $50,000. Consequently, pursuant to 12 O.S. 2001 § 1101.1, Defendants sought and were awarded some of their attorney fees and costs. Plaintiffs argue that the offer to confess was not valid because it did not identify to which of the Plaintiffs it was directed. In *Haddock v. Woodland Park Home, Inc.*, 2004 OK CIV APP 42, 90 P.3d 594, the Court of Civil Appeals (three judges concurring) held that a joint offer to a Plaintiff and her husband was invalid because 12 O.S.2001 § 1101.1 requires individual offers to each plaintiff. There must be a sufficiently *definitive offer* so each plaintiff can make a decision whether to accept the offer to confess judgment. While we concede the dissent's general statement of the law regarding singular and plural terms, the context of § 1101.1 would seem to require this result. Otherwise, a single plaintiff could reject an offer to confess judgment, and impose the penalty of attorneys fees on co-plaintiffs willing to accept the offer, should plaintiffs as a group fail to best the offer. For this reason, we must reverse the award of attorney fees in the case at hand. The $50,000 offer to the Plaintiffs as a group was invalid.[7]

¶ 16 For the reasons expressed, we AFFIRM the orders of the trial court, except the award of attorney fees under 12 O.S.2001 § 1101.1 is REVERSED.

JOPLIN, P.J., concurs in part, dissents in part with separate opinion; and

of fact, to be stated in writing by the party or parties requesting the same.

7. This holding does not apply to any costs that are awardable to the prevailing Defendants pursuant to 12 O.S.2001 § 929.

CAROL M. HANSEN, Judge, concurring in part, dissenting in part.

¶ 17 I dissent to Part I of the majority opinion. It does not point to any negligence on the part of *any* of the plaintiffs. I concur in Part II.

LARRY JOPLIN, Presiding Judge, concurring in part and dissenting in part.

¶ 1 While I concur with Part One of this opinion, I strongly dissent to Part Two. The majority holds Defendant's offer to confess judgment to Plaintiffs invalid because § 1101.1 requires individual offers to each Plaintiff. In support of this conclusion, the majority relies on *Haddock v. Woodland Park Home, Inc.*, 2004 OK CIV APP 42, 90 P.3d 594.[1]

¶ 2 In *Haddock*, the Court of Civil Appeals held an offer of judgment which "provided one judgment amount directed to both plaintiffs and expressly required the plaintiffs to accept the judgment together" was invalid for two reasons. First, the Court observed that the wording of § 1101.1 was in the singular, i.e., "any defendant" and "any plaintiff." Second, the Court reasoned that separate offers to each plaintiff was the best approach. This interpretation of § 1101.1 misapplies the law and violates the rules of statutory construction in the first part, and invades the province of the legislature in the second. In this respect, § 1101.1 provides:

After a civil action is brought for the recovery of money or property in an action other than for personal injury, wrongful death or pursuant to Chapter 21 of Title 25 or Section 5 of Title 85 of the Oklahoma Statutes, any defendant may file with the court, at any time more than ten (10) days prior to trial, an offer of judgment for a sum certain to any plaintiff with respect to the action or any claim or claims asserted in the action. . . .

1. While opinions of the Court of Civil Appeals do not carry precedential weight unless approved for publication by the Supreme Court, they may be persuasive. Not surprisingly, the author of the majority opinion was persuaded by *Haddock*, having authored it.

890

12 O.S. § 1101.1 (B)(1).[2]

¶ 3 In construing the language of this statute, we may not ignore the plain words, but must give each its ordinary meaning, and we may not "expand the plain wording of [the] statute by construction...." *Toxic Waste Impact Group, Inc. v. Leavitt,* 1988 OK 20, ¶ 10, 755 P.2d 626, 630. The Oklahoma Legislature has mandated the construction we must place on singular and plural words:

> Words used in the singular number include the plural, and the plural the singular, except where a contrary intention plainly appears.

25 O.S. § 25. The contrary intention *must plainly appear* and may not be inferred. *See, e.g., Rupp v. City of Tulsa, 1950 OK 28,* ¶ 8, *214 P.2d 913,* 915.

¶ 4 Treating the singular to include plural and vice-versa is consistent with the commonly accepted definition of the word, "any."[3] By judicial decision, "[t]he use of the word 'any' within a statute is equivalent and has the force of 'every' and 'all.'" *State ex rel. Porter v. Ferrell,* 1998 OK 41, ¶ 9, 959 P.2d 576, 578. Section 1101.1 does not indicate in *any* manner that it is limited to the singular, and "[w]here a statute is plain and unambiguous and its manifest intention and purpose is clearly shown by the language employed therein, *the court is without authority to render a different meaning or construction* thereon, in order to avoid an inequality that may arise in isolated cases." *In re Assessment of Champlin Refining Co.,* 1940 OK 67, ¶ 0(3), 99 P.2d 880. (Emphasis added.)

¶ 5 To interpret this statute, which, by both legislative and common law mandates, *clearly allows* "any" defendant to make an offer to "several plaintiffs," to *prohibit* such a singular, unapportioned offer turns statutory and common law jurisprudence on its head. The first rationale of *Haddock* is wrong and should not be followed by this court.

¶ 6 Although candidly admitting "[n]o published Oklahoma case has ruled whether the use of the singular in the statute requires that an offer be made to each plaintiff singly," the Court in *Haddock* secondly relied on other states' decisions to conclude that requiring separate offers was the best approach. *Haddock,* 2004 OK CIV APP 42, ¶¶ 14, 17, 90 P.3d at 597, 598.[4] While a statute requiring apportionment of offers to each plaintiff might be the better policy, such a decision is for the Legislature, not this Court:

> When a court is called on to interpret a statute, the court has no authority to rewrite the enactment merely because it does not comport with the court's view of prudent public policy. Also, the wisdom of choices made within the Legislature's lawmaking sphere are not our concern, because those choices—absent constitutional or other recognized infirmity—rightly lie within the legislative domain.

*Duncan v. Oklahoma Dept. of Corrections,* 2004 OK 58, ¶ 5, 95 P.3d 1076, 1079.

¶ 7 Because the majority clings to the faulty construction of § 1101.1 espoused in *Haddock,* I therefore dissent to Part Two. I concur with Part One of the majority opinion.

---

**2.** Section 1101.1(A)(1), governing "Actions for personal injury, wrongful death, and certain specified actions," contains identical language to § 1101.1(B), "Other cases."

**3.** The word, "any," "is often synonymous with 'either,' 'every,' or 'all.'" Black's Law Dictionary, 5th Ed. (West, 1979).

**4.** "Most importantly though, we agree with the cases which find that an unapportioned offer to multiple plaintiffs prevents each plaintiff from evaluating the settlement offer against the value of his or her claim and would lead to confusion in apportioning the various plaintiffs's responsibility for the attorney fees award after a judgment for less than the settlement offer.... [I]t is ... unclear ... which portion of the offer was directed to [wife] which portion to her husband. Clarity requires separate offers to each plaintiff...."